E

X

H

I

B

I

T


F

**Exhibit "F"**

```
 1                UNITED STATES DISTRICT COURT
                            for the
 2                    District of New Jersey

 3

 4   MICROBILT CORPORATION        :
                                  :
 5      Plaintiff,                :
                                  :
 6   v.                           :  Civil Action No:
                                  :  3:19-cv-00637
 7   BAIL INTEGRITY               :
     SOLUTIONS, INC., et al,      :
 8                                :
        Defendants.               :
 9                                :

10

11

12              REMOTE DEPOSITION OF

13                   MICHAEL WOODY

14

15           Wednesday, July 29, 2020

16                   9:31 a.m.

17

18           Asheville, North Carolina

19

20

21       Terry L. Bradley, Court Reporter

22
```



1      Q.     Do you know what the purchase price

2   was?

3      A.     I do not.

4      Q.     And what happened after it was

5   purchased?

6      A.     I went to work for Bail Integrity.

7   I was their Operations Director.

8      Q.     And what were your duties and

9   responsibilities as Operations Director?

10      A.     Well, initially I started out

11   running the bail side of the industry, making

12   sure that the bail reports were executed

13   properly, all the administrative things were

14   done, and the recovery aspect was completed.

15          We picked up a runoff contract,

16   which was a surety that went out of business,

17   and I was head over that until it closed.

18      Q.     And what do you mean by a "surety"?

19   What does a surety do?

20      A.     A surety is an insurance company

21   that backs a bail bondsman.  The fiduciary

22   behind the bail bondsman.



1       A.     Uh, August or September of 2018.

2       Q.     Let me backtrack for a second back

3    to Bail Integrity.  Did Bail Integrity have a

4    relationship with Bail Bond Technologies?

5       A.     They did.

6       Q.     What kind of relationship?

7       A.     Bail Bond Technologies was a data

8    entry software program that Bail Integrity was

9    going to try to go from Captira to.  Was going

10   to try to merge.

11      Q.     Would Bail Bond Technologies ever

12   tell Bail Integrity who they wanted you to

13   contract with?

14      A.     Not to my knowledge.

15      Q.     So for example, when Bail Integrity

16   entered an agreement with MicroBilt, was that

17   pursuant to any kind of order or request by

18   Bail Bond Technologies?

19             MR. HILLIARD:  Objection to the

20   form.

21             MR. JACOBOVITZ:  You may answer,

22   sir.



1      Q.     What do you mean by "skip tracing"?

2      A.     To try to locate a defendant.

3      Q.     Anything else?

4      A.     That's all that I knew of.  That's

5   all I knew MicroBilt was, was a skip tracing

6   program.

7      Q.     And how did they locate a defendant

8   through skip tracing?

9      A.     If they get a new utility or a new

10   convenience in their name, MicroBilt picks up

11   on it, just like TLO and Clear.

12          MR. JACOBOVITZ:  Lindsey, if we can

13   turn to Exhibit 1, please.  Letter of Intent.

14

15          (Exhibit 1 marked for

16   identification.)

17          MR. HILLIARD:  Jeff, are these new

18   markings for this deposition?  Or are you using

19   the same exhibit numbers from the last

20   deposition?

21          MR. JACOBOVITZ:  I think it's new

22   markings.



1          MR. HILLIARD:  It is?

2          MR. JACOBOVITZ:  Yes.

3   BY MR. JACOBOVITZ:

4      Q.    Mr. Woody, I show you what's been

5   designated Exhibit 1.  It's a Letter of Intent

6   with MicroBilt.  Do you recognize this

7   document?

8      A.    Vaguely, I do.

9      Q.    Do you know who filled it out?

10     A.    I don't.

11     Q.    Is that your handwriting?

12     A.    The "Please explain in detail" could

13  possibly be my handwriting, yes.  Yes, that is

14  my handwriting.

15         MR. JACOBOVITZ:  Okay.  And if we

16  could move down, Lindsey.

17  BY MR. JACOBOVITZ:

18     Q.    Sir, do you see Mr. Shirah's

19  signature there?

20     A.    I do.

21     Q.    Do you recognize his signature?

22     A.    I do.



MICHAEL WOODY                                          July 29, 2020
MICROBILT vs BAIL INTEGRITY SOLUTIONS                          30

1      Q.    Is that his signature?

2      A.    I haven't seen his signature in a

3  couple years.  It looks like his signature,

4  yes.  I can't be 100 percent.

5      Q.    Did you sign that for him?  Or did

6  anyone else to your knowledge sign it for him?

7      A.    I did not sign that for him, but I

8  don't know if anyone else did.

9      Q.    Are you aware of whether Mr. Shirah

10  was aware that this Letter of Intent had been

11  signed for him or it was his signature?

12          MR. HILLIARD:  Objection to form.

13          THE WITNESS:  I don't know.

14  BY MR. JACOBOVITZ:

15      Q.    Did you ever discuss this document

16  with Mr. Shirah?

17      A.    I don't recall.

18      Q.    That's not his electric signature,

19  his DocuSign signature, is it?

20          MR. HILLIARD:  Objection to form.

21          THE WITNESS:  No, that's not a

22  DocuSign.



```
 1    BY MR. JACOBOVITZ:

 2         Q.    Did you discuss this document with

 3    Mr. Shirah at all?

 4         A.    I don't recall.

 5         Q.    Did you send this document to

 6    MicroBilt after it was signed?

 7         A.    I don't recall if I sent it or not.

 8         Q.    Does this document accurately state

 9    the purposes for which Bail Integrity intended

10    to use MicroBilt services?

11         A.    Yes.  To verify someone has

12    utilities or something in their name.

13              MR. JACOBOVITZ:  Okay.  Lindsey, if

14    you can move it up a little bit.

15    BY MR. JACOBOVITZ:

16         Q.    Could you read your handwriting

17    there under bail bond services.

18         A.    "Used to determine that clients

19    under bail or considered for bail -- "

20         Q.    If you could slow down.

21         A.    "Used to determine that clients

22    under bail or considered for bail are not using
```



1  told you about him selling pings.  Did you note

2  for the record who that person was?

3       A.    I have no idea.  I just heard it

4  through the grapevine, through the bail bond

5  grapevine.  Kind of like a hair salon,

6  everybody gossips.

7       Q.    Is it a big grapevine?

8       A.    Yeah.

9       Q.    Did you hear it through the

10 grapevine anything about the article?

11      A.    No.

12      Q.    So getting back to leaving Bail

13 Integrity, would you call it a friendly split?

14      A.    No.

15      Q.    And why was it unfriendly.

16      A.    Uh, he didn't like the fact I left

17 and was going to start my own business.

18      Q.    "He" being Brian Shirah?

19      A.    Correct.

20      Q.    Did he tell you he didn't like the

21 fact that you left?

22      A.    Yeah.



1   Q.   What did he tell you?

2   A.   He's just displease that I left.

3   Q.   Did he indicate why he was

4   displeased?

5   A.   No.  Because I was going to become

6   his competition.

7   Q.   So he was looking at it as a

8   business loss?

9   A.   Yes.

10       MR. HILLIARD:  Objection to the

11   form.

12   BY MR. JACOBOVITZ:

13   Q.   And is that your current

14   relationship with Bail Integrity?  Is that a

15   competitive relationship?

16       Would you consider --

17       Well, strike that.

18       Would you consider your relationship

19   with Bail Integrity currently to be a business

20   relationship?

21   A.   No.

22   Q.   And it's a competitive relationship?



MICHAEL WOODY                                          July 29, 2020
MICROBILT vs BAIL INTEGRITY SOLUTIONS                        99

1       Q.    Can you testify under oath today if

2    anyone else had access to that other than Mr.

3    Shirah and possibly Mr. Norvell?

4       A.    I can't.

5       Q.    And Is that because you were not

6    involved in setting up the logins for that

7    Mobile Device Verification program?

8       A.    I was not involved.

9       Q.    You then later testified that you

10   thought it might be possible that Mr. Alvarez

11   had access, correct?

12      A.    Yes.

13      Q.    But you don't --

14            Are you certain?  Do you know one

15   way or the other?

16      A.    No, sir.

17            MR. JACOBOVITZ:  Objection.  Form.

18   BY MR. HILLIARD:

19      Q.    Bear with me.  I apologize.  I just

20   want to make this as efficient as possible.

21      A.    Yes, sir.

22      Q.    Mr. Jacobovitz asked you some things



MICHAEL WOODY                                July 29, 2020
MICROBILT vs BAIL INTEGRITY SOLUTIONS                  100

1   about that VICE Motherboard article that was

2   published.  Do you recall that?

3        A.    Yes.

4        Q.    And I wrote this down, your

5   testimony.  He asked you something to the

6   effect of:  Do you know why someone would sell

7   a ping?

8             And again, I don't want to put words

9   in your mouth.  I'm just trying the refresh

10  your recollection so I can ask you a couple

11  questions about it.

12            And I believe your testimony was

13  something to the effect of:  You would have to

14  be a dummy to do this.

15       A.    That's correct.

16       Q.    Do you recall that?

17       A.    Yes.

18       Q.    Can you elaborate on that?  What did

19  you mean by that?

20            MR. JACOBOVITZ:  I object to the

21  form.  That wasn't the nature of my question.

22            But go ahead.



```
 1   BY MR. HILLIARD:

 2       Q.    Whatever, do you remember saying:

 3   You'd have to be a dummy to do this?

 4       A.    Yes.

 5       Q.    What were you intending to say?

 6   What did you mean by that?

 7       A.    That why would you do this outside

 8   your company?  That's what I mean.  Why would

 9   you do this to something outside your company?

10       Q.    Do what?

11       A.    Ping a phone.  Sell a ping.  Do

12   business with somebody outside your company.

13       Q.    Okay.  And am I correct, sir, that

14   you have no reason to believe or have any facts

15   as you're sitting here today you could tell us,

16   that Mr. Shirah had anything to do with selling

17   a ping to a reporter or a contact outside of

18   his company, correct?

19       A.    That was --

20            MR. JACOBOVITZ:  Objection.  Form.

21            MR. HILLIARD:  What was your answer?

22            THE WITNESS:  That was after I left.
```



 1   I have no idea.

 2           MR. HILLIARD:  Okay.

 3           THE WITNESS:  I can't imagine he

 4   would, but that's --

 5   BY MR. HILLIARD:

 6      Q.    And why is that hard to imagine that

 7   he would do that?

 8      A.    I think he would be smarter than

 9   that.

10           MR. HILLIARD:  Those are all the

11   questions I have for you, Mr. Woody.  I

12   appreciate your time.

13           THE WITNESS:  Thank you.

14

15                   EXAMINATION

16   BY MR. JACOBOVITZ:

17      Q.    Okay.  I have a few follow-ups.

18      A.    Okay.

19      Q.    Mr. Woody, did you -- this is in

20   response to what you were asked by Mr.

21   Hilliard -- did you tell the investigator about

22   what you had heard about Juan Alvarez?



MICHAEL WOODY                                          July 29, 2020
MICROBILT vs BAIL INTEGRITY SOLUTIONS                          103

1        A.    I don't recall.

2        Q.    And you just testified that you

3    can't imagine Shirah would sell a ping.  Is

4    that correct?

5        A.    I can't.  That's correct.

6        Q.    Now Shirah owns Bail Integrity.  Is

7    that correct?

8        A.    He does.

9        Q.    And he's 100 percent owner?

10        A.    Unless something has changed.  He

11    was.

12        Q.    And Alvarez was a recovery agent for

13    Bail Integrity?

14        A.    He was.

15        Q.    And whoever sold the ping to the

16    reporter, you believe was working for Bail

17    Integrity.  Is that correct?

18        A.    It said --

19              The article says yes.  I have no

20    reason to doubt the article.

21        Q.    Okay.  And to your knowledge did

22    Shirah ever confront Alvarez or anyone else



MICHAEL WOODY                                          July 29, 2020
MICROBILT vs BAIL INTEGRITY SOLUTIONS                        104

 1 │ about who sold the ping?

 2 │     A.    I was gone.  I don't know.  That was

 3 │ before --

 4 │           That was after I left.  I don't have

 5 │ any idea.

 6 │           MR. JACOBOVITZ:  Okay.  I have no

 7 │ further questions.

 8 │

 9 │                    EXAMINATION

10 │ BY MR. HILLIARD:

11 │     Q.    Just one follow-up.

12 │           So you can't testify under oath you

13 │ know who sold the ping, correct?

14 │     A.    Correct.

15 │     Q.    And I assume that also means you

16 │ can't --

17 │           MR. JACOBOVITZ:  Objection.  Form.

18 │           MR. HILLIARD:  Okay.  Let me --

19 │           MR. JACOBOVITZ:  Craig, he's

20 │ obviously under oath.  You keep asking him

21 │ about testifying under oath.  He's under oath.

22 │ He knows that.  But go ahead.



1   BY MR. HILLIARD:

2       Q.   So you can't testify that it was

3   anyone who was even associated with Bail

4   Integrity Solutions who sold a ping, correct?

5              MR. JACOBOVITZ:  Objection.  Form.

6              THE WITNESS:  I only know what the

7   article says.

8              MR. HILLIARD:  Thank you.  Nothing

9   further?

10             MR. JACOBOVITZ:  1 minute.  Let me

11  just see if I have anything further.

12             I have nothing further right now.

13             MR. HILLIARD:  Thanks for your time.

14             Is the witness going to read and

15  sign?

16             MR. JACOBOVITZ:  You have a right to

17  read the transcript and sign it in terms of

18  verifying its accuracy.  Do you intend to do

19  that?

20             THE WITNESS:  No, sir.

21             MR. JACOBOVITZ:  Okay.

22             MR. HILLIARD:  Regular for me.

