EXHIBIT

G

**Exhibit "G"**

```
             UNITED STATES DISTRICT COURT
                      for the
                 District of New Jersey


  MICROBILT CORPORATION         :
                                :
     Plaintiff,                 :
                                :
  v.                            : Civil Action No:
                                : 3:19-cv-00637
  BAIL INTEGRITY                :
  SOLUTIONS, INC., et al,       :
                                :
     Defendants.                :



              REMOTE DEPOSITION OF

                  JOSHUA NORVELL



            Thursday, July 30, 2020

                   9:29 a.m.



            Asheville, North Carolina




      Terry L. Bradley, Court Reporter
```



1  Asheville, but that was a little bit
2  short-lived. Times got a little rough for the
3  company, and so then I ended up getting the job
4  at Bail Integrity probably 6 months after
5  graduating.
6      Q.   Were you laid off from the company?
7  Or did you quit?
8      A.   Um, so I was --
9           I was offered a new opportunity
10 probably 2 weeks prior to the separation that
11 happened to go back to being a full-time bail
12 bondsman. I was the Director of Human
13 Resources, but I took that probably 2 weeks --
14 2 or 3 weeks -- prior to us leaving. Yeah.
15     Q.   Okay. And how did you end up at
16 Bail Integrity?
17     A.   Um, so, you know, they had --
18          When I started Mr. Shirah had just
19 acquired the company, and they were needing
20 some help with like reporting and just random
21 odds and ends to kind of get the office going.
22 I think that was in like April or May of 2017.

```
 1      Q.    Do you know who Mr. Shirah acquired
 2   the company from?
 3      A.    All I know is it was priorly he was
 4   like the Director of Operations prior for a
 5   different surety company that was in South
 6   Carolina.
 7      Q.    Is that Lion Surety?
 8      A.    Yes.  Yes.  Lion Surety.
 9      Q.    Okay.  Did Mr. Woody ever work at
10   Lion Surety?
11      A.    Yes, he did.
12      Q.    And when you joined Bail Integrity
13   approximately how many people worked there?
14      A.    Probably about 10 to 15.
15      Q.    And what is the name of the company
16   where you work right now?
17      A.    828 Bail Bonds.
18      Q.    And how many people work there?
19      A.    Um, so we're not like a corporate
20   office.  So we've got probably about I'd say at
21   least 50 agents that operate as 828, and then
22   probably close to 50 that are operating under a
```



```
 1   different business name, but just go through
 2   us.
 3        Q.    So the agents are independent
 4   contractors?
 5        A.    Yes, they are.
 6        Q.    Are they called consultants or
 7   independent contractors?
 8        A.    They're all 1099 independent
 9   contractors.
10        Q.    Do you have any W-2 employees?
11        A.    You have me.  I think I'm one of our
12   only --
13              Well, we've got like one other.
14   She's our risk girl.
15        Q.    And when you started at Bail
16   Integrity were most of the employees 1099
17   employees or were they W-2?
18        A.    I'm not too sure.  You know, even
19   with my role in human resources I didn't deal
20   with payroll or anything like that.  That was
21   Brian Shirah.  But I'd say, you know, probably
22   maybe half and half at that point.
```



```
 1   explain in detail."  Is that your handwriting?
 2        A.    No, sir.
 3        Q.    Mr. Woody indicated that that was
 4   his handwriting, and he read it to us
 5   yesterday.  Do you recognize that handwriting
 6   as his handwriting?
 7        A.    It looks like it.
 8        Q.    Okay.  And does this to you look
 9   like a true and accurate copy of the Letter of
10   Intent submitted by Bail Integrity to MicroBilt
11   as part of the application to use MicroBilt
12   services?
13              MR. HILLIARD:  Objection to the
14   form.  Lack of foundation.
15              MR. JACOBOVITZ:  You may answer.
16              THE WITNESS:  Yes.  I'm not sure.  I
17   don't recall much of the documentation that
18   went through, but yes.
19              MR. JACOBOVITZ:  Okay.  If we could
20   go down, Lindsey.
21   BY MR. JACOBOVITZ:
22        Q.    Sir, do you see the signature on the
```



```
 1   who --
 2            I don't know if he really dealt much
 3   with e-mails.  He was more like the phone guy
 4   for issuing new phones and keeping our ring
 5   central for the bail bond calls.  But I think,
 6   if any, you know, he might have had access to
 7   set up e-mails too.
 8       Q.   Did Bail Integrity have any
 9   safeguards in place to make sure that only
10   those individuals could access MDV?
11       A.   I'm not sure.  I would say probably,
12   no.
13       Q.   Did Bail Integrity provide any
14   guidance to its employees that used MDV to
15   ensure compliance with the Fair Credit
16   Reporting Act?
17       A.   I don't really think --
18            While I was there, I don't recall
19   MDV being used through MicroBilt.
20       Q.   Are you aware of whether Bail
21   Integrity ever used MicroBilt services for any
22   purpose other than what was stated in the
```



```
 1   Letter of Intent in the access application?
 2        A.    I'm not aware.
 3        Q.    Did you personally ever use the
 4   Mobile Device Verification service?
 5        A.    No, sir.
 6        Q.    Were Bail Integrity employees told
 7   not to use MicroBilt services?
 8        A.    I don't really remember a
 9   conversation being taken about to use it or to
10   not use it unfortunately.
11        Q.    Did you ever sell pings to third
12   parties?
13        A.    No, sir.
14        Q.    Do you know anyone at Bail Integrity
15   who did?
16        A.    No, sir.
17        Q.    Did you hear any rumors ever of
18   anyone who was doing that?
19        A.    So when after we had left, you know,
20   probably like 4 or 5 months later on a social
21   media group, that article about the selling the
22   phone pings for $300 to a bounty hunter or
```



```
 1   licensing classes?
 2        A.    No, sir.
 3        Q.    Do you know who Allen Hart is?
 4        A.    No, sir.
 5        Q.    Okay.  Sir, when did you leave Bail
 6   Integrity?
 7        A.    Um, it was probably the second week
 8   of September.
 9        Q.    Of what year?
10        A.    2018.
11        Q.    And why did you leave?
12        A.    Um, because my --
13              Both of my parents decided that they
14   were parting with Bail Integrity, and you know,
15   that kind of just meant I would feel awkward
16   there, so I just decided to go with them.
17        Q.    What is your mother's name?
18        A.    Wendy Ward.
19        Q.    Okay.  And would you call this a
20   friendly split?
21        A.    So, on my part, yeah.  I know, you
22   know, Brian's really mad about it, but I --
```



```
 1   company safeguards that were put in place to

 2   prevent the unauthorized use or improper use of

 3   the Mobile Device Verification software.  Do

 4   you recall that?

 5        A.   Yes, sir.

 6        Q.   And I wrote down your answer because

 7   I wanted to ask you about it.  Your testimony

 8   was:  I would say probably, no.

 9             Are you certain that there were no

10   safeguards put in place?

11        A.   I'm not certain.  But if there were,

12   it wasn't something that I was aware of.

13        Q.   Did Mr. Shirah ever tell you to do

14   anything that you considered to be improper or

15   unauthorized in connection with the Mobile

16   Device Verification software?

17        A.   No, sir.

18        Q.   Did he ever tell you that the

19   company was involved in any way with selling

20   unlawful pings or selling pings for unlawful

21   purposes?

22        A.   No, sir.
```



1    Q.    And you're not aware of any facts to
2    indicate that he did so, correct?
3    A.    No, sir.
4    Q.    Or that he had knowledge that anyone
5    in the company was actually doing so, correct?
6    A.    No, sir.
7    Q.    And you don't know if this sale of
8    this ping that actually occurred that you told
9    us you read about in the Motherboard article,
10   you don't know who did that?
11   A.    I have no --
12         I couldn't pinpoint it to one exact
13   person.
14   Q.    When you left Bail Integrity in the
15   middle of September of 2018, you told us that
16   you physically took your laptop with you the
17   day you left, correct?
18   A.    Yes.
19   Q.    On the day you left the company had
20   you done anything to wipe any of the
21   information or try and wipe or delete anything
22   from that laptop?



800.211.DEPO (3376)
EsquireSolutions.com