**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICROBILT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BAIL INTEGRITY SOLUTIONS, INC., et al.,<br><br>Defendants. | Civil Action No. 19-637 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Bail Integrity Solutions, Inc. ("Bail Integrity") and Thomas Brian Shirah's ("Shirah") (collectively, "Defendants") Motion for Partial Summary Judgment. (ECF No. 40.) MicroBilt Corporation ("MicroBilt" or "Plaintiff") opposed (ECF No. 45), and Defendants replied (ECF No. 47). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion is denied.

**I.   BACKGROUND**

Plaintiff is a consumer reporting agency and reseller of consumer credit information. (Compl. ¶ 5, ECF No. 1.) "In that capacity, [Plaintiff] maintains a . . . database of consumer credit information, allowing its . . . customers to purchase access to such information for their lending, leasing, collections, and risk management needs." (*Id.*) In 2018, Plaintiff began offering a Mobile Device Verification service ("MDV"), which allows customers to confirm that an applicant for financial services owns a valid mobile phone number. (*Id.* ¶ 9.)

As a reseller of consumer credit information, Plaintiff is required to comply with various consumer data protection statutes and regulations, including the Fair Credit Reporting Act ("FCRA") and the Gramm-Leach Bliley Act ("GLBA"). (*Id.* ¶ 6.) Plaintiff alleges that, to ensure compliance with such requirements, it requires customers "to be fully credentialed and approved as authorized end users of [its] services." (*Id.* ¶ 7.) The credentialing process includes: (1) completion of the User Agreement, the Application for Use of Consumer Reports, and the On-Site Business Inspection and Verification form; (2) an extensive background check on the business and its principals and/or owners; and (3) compliance review and management approval. (*Id.*) Plaintiff alleges it only provides services to "those businesses that demonstrate a legitimate 'permissible purpose' as defined under the FCRA, [or] a legitimate 'permitted use' as defined under the GLBA." (*Id.* ¶ 8.)

Plaintiff alleges that, on July 26, 2018, Bail Integrity, a registered bail bondsman service, entered into a User Agreement for its services. (*Id.* ¶¶ 14, 15; *see* User Agreement, Ex. A to Compl. 1–5, ECF No. 9-1.) The User Agreement contained Plaintiff's standard terms and conditions. (Compl. ¶ 15.) According to Plaintiff, by entering the User Agreement, Bail Integrity certified: (1) it would only use the service for a "'permissible purpose' as defined in the FCRA or 'permitted use' under the GLBA" and "no other purpose or use"; (2) "all Information will be held in strict confidence"; and (3) "the Confidential Information disclosed to it by [Plaintiff] shall not be disclosed to any third party and shall be used only for the purposes herein." (*Id.* ¶ 16.)

Plaintiff alleges that, on the same day Bail Integrity entered the User Agreement, Thomas Brian Shirah, Bail Integrity's CEO, signed an Addendum to use Plaintiff's MDV service. (*Id.* ¶ 15; *see* Addendum, Ex. A to Compl. 6, ECF No. 9-1.) The Addendum specified that "consumer consent guidelines and language [are] required to be implemented in any use of the MicroBilt

2

Mobile Device Verification products and services." (Compl. ¶ 17.) Plaintiff alleges that this provision required Bail Integrity to "provide a version of its hard copy consumer agreement and/or provide screenshots of its online consumer consent process with the required language included, prior to use of such MicroBilt products and services, and upon request thereafter for audit and compliance purposes." (*Id.*)

Shirah also completed an Application for Access to Consumer Reports and FCRA Related Data. (*Id.* ¶ 18; Appl., Ex. B to Compl., ECF No. 9-2.) Bail Integrity allegedly indicated on the Application that Plaintiff's services would be used for credit extension, account review, account collection, and bankruptcy filing, as allowed under the FCRA, as well as for fraud prevention, credit and collection activity, skip tracing, and asset verification searches, as allowed under the GLBA. (*Id.* ¶¶ 18–19.) In a Letter of Intent, Bail Integrity allegedly indicated it would use Plaintiff's services to determine whether clients under bail or being considered for bail were using other persons' social security numbers. (*Id.* ¶ 21; Letter, Ex. C to Compl., ECF No. 9-3.)

On January 8, 2019, *Motherboard* published an article with the following subheading: "T-Mobile, Sprint, and AT&T are selling access to their customers' location data, and that data is ending up in the hands of bounty hunters and others not authorized to possess it, letting them track most phones in the country." (Compl. ¶ 22.) The article's author, Joseph Cox, reported that he paid $300 to a bounty hunter affiliated with Bail Integrity to geolocate, or "ping" a phone number, which the bounty hunter did with the owner of the phone's consent. (*Id.* ¶¶ 22, 25.) The article also reported that Plaintiff sold its geolocation services to various private industries with little oversight. (*Id.* ¶ 23.) Through the article, Plaintiff learned its MDV service was being resold to unlicensed end users on the black market. (*Id.* ¶ 25.)

3

Plaintiff filed the instant Complaint against Defendants alleging the following claims: Count One—Breach of Contract; Count Two—Breach of Duty of Good Faith and Fair Dealing; Count Three—Fraudulent Misrepresentation; and Count Four—Misappropriation of Trade Secrets in violation of the Defend Trade Secrets Acts ("DTSA"), 18 U.S.C. §§ 1836, *et seq.* Defendants subsequently moved to dismiss the matter. In its November 25, 2019 memorandum opinion ("Mem. Op.," ECF No. 22), the Court dismissed Count One and Count Two as to Shirah and dismissed Count Four as to all Defendants. (*Id.* 10–13.) In the instant motion, Defendants moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56[1] as to Count Three—Fraudulent Misrepresentation. (*See generally*, Defs.' Mem., ECF No. 40-1.)

## II. **LEGAL STANDARD**

Pursuant to Rule 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* An issue is genuine if there is sufficient evidentiary support such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). The party moving for summary judgment has the initial burden of proving an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[1] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

4

If the non-moving party bears the burden of proof at trial, the movant may discharge its burden by pointing to an absence of evidence necessary to support the non-movant's claim. *Id.* at 325. Alternatively, a moving party may submit affirmative evidence that negates a material element of the non-moving party's claim. *Id.* If the movant brings affirmative evidence or makes a showing that the non-movant lacks evidence essential to its claim, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine [dispute] for trial." Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 321 & n.3. The burden of persuasion, however, rests on the non-moving party to establish each element necessary to succeed on the claims on which it bears the burden of proof at trial. *Id.* at 322.

To decide whether a genuine dispute of material fact exists, the Court must consider all facts, drawing all reasonable inferences in a light most favorable to the non-moving party. *Kaucher*, 455 F.3d at 423. On a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine [dispute] for trial." *Anderson*, 477 U.S. at 249. Absent a genuine dispute for trial, summary judgment as a matter of law is proper.

### III. <u>DISCUSSION</u>

As discussed more fully below, Defendants' motion for partial summary judgment is denied because a genuine dispute of material fact exists as to Defendants' intent to commit fraud prior to signing the July 2018 contract documents.

### A. Parties' Positions

Defendants argue that because of the economic loss doctrine,[2] Count Three—Fraudulent Misrepresentation, is a fraudulent inducement claim. (Defs.' Moving Br. 6, ECF No. 40-1.) Defendants assert that in order to satisfy a fraudulent inducement claim, Plaintiff must establish five elements: "(1) a material representation by defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intent that the plaintiff rely upon it; (4) reasonable reliance by the plaintiff, and (5) resulting damage to the plaintiff." (*Id.* at 7); *See also Farris v. Cnty. of Camden*, 61 F. Supp. 2d 307, 340 (D.N.J. 1999) (internal citation omitted). Without specifying which element Plaintiff has failed to satisfy, Defendants contend that there is no evidence that shows they induced Plaintiff to give them access to the MDV service for unlawful purposes. (*See generally* Defs.' Moving Br.) In support of their contention, Defendants emphasize that one sale of a single ping for a $300 monetary gain is too little of a profit for Defendants to have intentionally risked the consequences of a fraudulent scheme. (*See id.* at 7–8.)

Plaintiff argues that drawing all reasonable inferences in the light most favorable to the non-moving party, a reasonable jury would "determine that Defendants never intended to keep their promise to only use MicroBilt's services for legally permissible purposes." (Pl.'s Opp'n Br. 1, ECF No. 45.) First, Plaintiff presents evidence that Bail Integrity's owner and CEO, Shirah, was the only individual at Bail Integrity who had access to the MDV service. (*Id.* at 5.) For example, Bail Integrity's then Operations Director, Michael Woody, and then Director of HR, Joshua Norvell, testified that only Shirah had access to the MDV services. (*Id.*; *see also* Woody Dep. Tr.

---

[2] "Generally, the economic loss doctrine prohibits [a] plaintiff[ ] from recovering in tort economic losses to which [it is] entitled only by contract. Whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 308 (D.N.J. 2009) (internal citations omitted).

37:7–12, Ex. A to Jacobovitz Decl., ECF No. 45-5; Norvell Dep. Tr. 28:7–12, Ex. B to Jacobovitz Decl., ECF No. 45-6.) This is corroborated by Mathew Roesly's, MicroBilt's New Business Account Manager, declaration that Shirah admitted to him that he was the only person at Bail Integrity that had access to the MDV service, and that his team does not have access to it. (Pl.'s Opp'n Br. 5; Roesly Decl. ¶¶ 7, 9, ECF No. 45-1.) Despite Shirah's claim that Bail Integrity did not use MicroBilt's MDV service (Shirah Dep. Tr. 71:25, 72:1–10, Ex. G to Jacobovitz Decl., ECF No. 45-11), Plaintiff puts forward evidence that username "bshirah@bailintegritysolutions.com" accessed the MDV service on a total of 72 occasions. (*See* Jan. 2019 E-Mails Bates Range MB 760–763, Ex. F to Jacobovitz Decl., ECF No. 45-10.)

Although Defendants assert that the *Motherboard* article did not mention "Bail Integrity" or that the "bounty hunter" that sold Microbilt's data services to it was in any way affiliated with Bail Integrity (Defs.' Moving Br. 3), Plaintiff offers evidence demonstrating that Bail Integrity was responsible for this transaction. In order to determine which of its customers was ultimately responsible for selling the ping to Joseph Cox, Plaintiff ran an internet search using available information within the article—such as the referenced date, cell phone carrier, and location—and found a cell phone number that belonged to a New York *Motherboard* associate of Joseph Cox. (Pl.'s Opp'n Br. 7; Page Decl. ¶ 6a, ECF No. 45-3.) After searching for a customer account that was associated with the cell phone number within MicroBilt's system, Plaintiff determined that the phone number was tied to an MDV transaction performed by Bail Integrity. (Pl.'s Opp'n Br. 7; Page Decl. ¶ 6c.) Plaintiff was able to link the transaction to Bail Integrity because Plaintiff assigns each of its customers a unique code that is tied to that customer's account, and when a customer uses MDV to geolocate a cell phone, that use is tied to the customer's specific code. (*Id.*) In addition, the transaction matched Bail Integrity's unique IP address. (Page Decl. ¶¶ 6c, 7.)

MicroBilt's technology partner, Bail Bond Technologies, also confirmed that Bail Integrity was responsible for the transaction. (*Id.* ¶ 8.)

Although Defendants insist that "no evidence exists to identify who gained access to Bail Integrity's account" (Defs.' Moving Br. 4), it is unclear whether Defendants are attempting to argue that someone other than Shirah within Bail Integrity gained access to their account, or that someone outside Bail Integrity somehow gained access to their account. In any event, Defendants offer no evidence to support either position. In addition, Plaintiff argues that Defendants' refusal to comply with Plaintiff's audit request also raises the likelihood that Defendants were responsible for the transaction with Joseph Cox.[3] (*See* Pl.'s Opp'n Br. 8, 18.)

Next, Plaintiff argues that it has established each element required for its fraudulent inducement claim. (*See id.* at 10–19.) Plaintiff argues that it has established the first element of its claim, namely that Defendants made a representation regarding a presently existing fact through the Letter of Intent and the Access Application. (*Id.* at 12.) According to Plaintiff, Bail Integrity's statements in the Letter of Intent that it only planned to use MicroBilt's services to prevent fraud from persons under bail and being considered for bail represent that Defendants would only use MicroBilt's services for lawful purposes. (*See id.* at 12–13.) Plaintiff then attempts to establish the second element of fraudulent inducement, which the Court will discuss in the next section. Plaintiff also explains why the two reliance elements are met. (*See id.* at 13.) The last element of damage is set forth in the original Complaint. (Compl. ¶ 26.) In their reply, Defendants have not challenged any of the elements required to establish fraudulent inducement except the second element—

---

[3] Plaintiff asserts that "[t]he audit request was consistent with the original contract" between the parties as both the MDV Addendum and User Agreement required Bail Integrity to "submit to audits, and provide such consumer consent and/or other verification of legitimate access to MicroBilt's products and services." (Pl.'s Opp'n Br. 8–9.)

knowledge of or belief by the defendant of the falsity of its material representation, or simply the element of fraudulent intent before the parties contracted.[4] (*See generally* Defs.' Reply Br., ECF No. 47.)

### B. A Genuine Dispute of Material Fact Exists as to Defendants' Intent to Commit Fraud before the Parties Contracted

Plaintiff attempts to establish the element of fraudulent intent by circumstantial evidence. (*See* Pl.'s Opp'n Br. 11.) The Third Circuit has held that:

> [i]ntention may be derived from circumstantial evidence such as utter recklessness and implausibility of the statement in light of subsequent acts and events, a showing that the promisor's intention to perform was dependent upon contingencies only known to him, or evidence showing at the time of the promise that the promisor could not or would not fulfill the promise.

*Luscko v. Southern Container Corp.*, 408 F. App'x 631, 634–35 (3d Cir. 2010). First, Plaintiff argues that a reasonable jury could infer that Defendants intended the scheme all along because of the short time frame between the beginning of the parties' contractual relationship, July 2018, and when Defendants allegedly began selling pings, December 2018. (Pl.'s Opp'n Br. 14.)

Second, Plaintiff argues that the record reflects Shirah's conflicting motives to enter into a contract with MicroBilt and that such conflicting motives also speak to Defendants' intent to defraud before contracting. (*Id.* at 15.) Specifically, Plaintiff points to Shirah's deposition testimony in which he claimed that Bail Integrity contracted with MicroBilt because Bail Bond Technologies, Bail Integrity's software vendor and MicroBilt's technology partner, "made it a requirement for [Bail Integrity] to use it." (Shirah Dep. Tr. 22:9–15, 49:6–7.) Nevertheless, Bail Integrity's then Operations Director, Michael Woody, stated that he was not aware that Bail Bond

---

[4] Drawing all reasonable inferences in the light most favorable to Plaintiff, knowledge of or belief by Defendants of the falsity of the material representation of planning to use Plaintiff's service for a lawful purpose is the equivalent of intending to use Plaintiff's service for an unlawful purpose or intending to defraud Plaintiff. *See generally Farris*, 61 F. Supp. 2d at 307.

Technologies required Bail Integrity to contract with MicroBilt. (*See* Woody Dep. Tr. 17:15–18, 18:5–13.) According to Michael Woody, Bail Integrity decided to contract with MicroBilt because "[its] data entry program was much cheaper than Captira." (*Id.* at 18:16–22, 19:1–10.) Woody claimed that he and Shirah discussed the cost of MicroBilt's service at a conference table in the office, assessed the price together, and Shirah initiated the talks with MicroBilt. (*Id.*) Woody also remarked that Shirah "appeared very interested in contracting with MicroBilt." (*Id.*) In addition, Shirah testified regarding his concerns about MicroBilt's services such as a lack of customer service, a non-user-friendly interface, and lack of training. (Shirah Dep. Tr. 48:2–6.) But when questioned whether Shirah was aware of those issues before or after contracting with MicroBilt, Shirah did not offer a clear answer to the question. (*Id.* at 48:24–25, 49:1–2.)[5]

In their reply, Defendants argue the fact that Shirah accessed the MDV service multiple times during the first four months for proper and lawful purposes demonstrates that Shirah intended to enter into the contract with MicroBilt for such proper and lawful purposes. (*See* Defs.' Reply Br. 4.) Defendants offer Michael Woody's testimony that "Shirah would have to be a 'dummy' to risk his business and exposure in a lawsuit for a paltry $300," in support of their argument that "[i]f misusing the service for financial gain was Shirah's intent, one lone sale of a ping for $300 is hardly indicative of such intent." (*Id.*; *see* Woody Dep. Tr. 100:12–15, 101:5–22, 102:1–9, Ex. F. to Hilliard Decl., ECF No. 40-9.) Ultimately, Defendants attempt to convey the idea that because a single transaction of selling a ping for $300 would not have been worth the risk, and would have been against their economic interests, this could not have been their motive. Defendants argue:

---

[5] Shirah answered, "[w]e learned this when, you know, we didn't—we tried to do business with MicroBilt when we were at Lion Surety Services, and that's how I knew Matt to start with."

10

> There is simply no rational reason why Shirah would have gone to the trouble of fraudulently inducing MicroBilt to give his company access to the software in July 2018, all for the purpose of waiting four months to sell one ping in December 2018 for $300. No reasonable juror could conclude this was fraud.

(Defs.' Reply Br. 5.)

Defendants' arguments, however, only tend show that they dispute Plaintiff's factual contention that Defendants had fraudulent intent before contracting. When drawing all reasonable inferences in the light most favorable to the non-moving party, MicroBilt, the Court finds that a reasonable jury could find that Defendants never intended to keep their promise to only use MicroBilt's services for legally permissible purposes. For example, Defendants' argument that they accessed MicroBilt's service numerous times for lawful purposes would not necessarily show that they never intended to use the service for unlawful purposes, because a history of accessing the service for lawful purposes can also have the effect of making sporadic access for unlawful purpose less likely to be detected. If the facts were to show that Defendants always accessed MicroBilt's services for unlawful purposes, it would tend to prove that Defendants never intended to use the service for any lawful purposes.

As to Defendants' argument that economic interest cannot justify a single sale of $300, a possible alternative explanation is that Defendants intended to make more profits from selling the pings but were immediately caught after only making a $300 gain. Considering this possible alternative explanation, and Plaintiff's evidence demonstrating Shirah's conflicting motives for contracting with MicroBilt, the Court finds that there exists a genuine dispute of material fact as to whether Defendants had fraudulent intent before entering into the contract with MicroBilt. *See Farris*, 61 F. Supp. 2d at 351 (denying motion for summary judgment because the record contained conflicting admissible evidence on the issue of whether the defendant intended to defraud the plaintiff).

### C. Count Three—Fraudulent Misrepresentation—Is Not Barred by the Economic Loss Doctrine

In their reply brief, Defendants attempt to revisit the economic loss doctrine. (*See* Defs.' Reply Br. 1–3.) Defendants argue that Count Three should be barred by the doctrine because "the alleged 'false representation' of fact cannot be the same promises made in the underlying contract, because otherwise every breach of a written promise in a contract would also be subject to a claim in tort." (*Id.* at 3.) As the Court explained in its November 25, 2019 memorandum opinion, however, Defendants' argument is unpersuasive because the conduct alleged is extrinsic to the parties' contract and, consequently, the economic loss doctrine does not bar Count Three. (Mem. Op. 12–13.) Specifically, the Court disagrees with Defendants' interpretation of *Arcand v. Brother Int'l Corp.* Consistent with the Court's November 25, 2019 memorandum opinion, the *Arcand* court found that "a plaintiff may be permitted to proceed with tort claims sounding in fraud in the inducement so long as the underlying allegations involve misrepresentations unrelated to the performance of the contract, but rather precede the actual commencement of the agreement." *Arcand*, 673 F. Supp. 2d at 308. Here, the fraudulent inducement claim is not related to the performance of the contract, and it precedes the actual commencement of the contract. The economic loss doctrine, therefore, does not bar Count Three.

### IV. CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion for partial summary judgment. An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp<br>
**MICHAEL A. SHIPP**<br>
**UNITED STATES DISTRICT JUDGE**